MILTON BRAUSE et al., Respondents, *v.* MARSHALL GOLDMAN et al., Appellants.

First Department, April 21, 1960.

*Daniel S. Berman* of counsel (*Hugo Rothschild* with him on the brief; *Daniel S. Berman*, attorney), for appellants.

*Clarence S. Barasch* for respondents.

BOTEIN, P. J.   Defendants, initially through their attorney, carried on negotiations with plaintiffs to lease a building owned by defendants.   A conference, not attended by defendants, was held, at which the terms of a proposed 99-year lease were discussed.

On July 15, 1959, in order " to confirm and clarify " the discussions held the previous week, defendants' attorney wrote a

letter to the broker outlining the subjects considered. This letter, one of the documents relied on most heavily by plaintiffs as a memorandum of agreement, required approximately one page to list nine topics previously discussed. The letter recited the period the lease was to run, the amount of rent to be paid, cancellation privilege, security, right of demolition and alteration, mortgages, commissions, and the lessee's right of first refusal to purchase. The lessee's demolition and alteration rights were to be spelled out "under conditions more fully agreed upon in a formal instrument."

The letter, drafted by defendants' attorney, who had not been afforded an opportunity to consult with his clients, purported on its face to be merely a preliminary memorandum; and the draftsman explicitly disclaimed any intention that it be taken as a memorandum of complete agreement. Defendants' attorney wrote that since his clients were abroad, "a more formal commitment * * * will, of necessity, bear their signature, in order to be binding or of any legal effect." He went on to state:

"The purpose of this letter is to indicate to you that a serious attempt will be made to effect an agreement upon the basis above outlined, after relaying same to the owners of the premises to be leased, as we all realize the need for further negotiations and discussions before a lease mutually satisfactory can be arrived at, it being understood, of course, that neither this letter nor any discussions between us or between the principals or their attorneys, nor the exchange or preparation of any papers or memoranda will be deemed to constitute an agreement, until a formal written agreement has been duly executed and delivered.

"If the above outline of proposed lease is in accord with the understanding of the owners of the premises to be leased, and confirms your understanding of the same, then it is contemplated that the parties will endeavor to reach an agreement as soon as is practical, and in any event not later than October 1st, 1959. It is understood, of course, that pending a more formal agreement each of the principals shall be free to discontinue or withdraw from the negotiations without incurring any obligation or liability to one another."

Thus it is apparent that the letter of July 15, 1959 marked the reaching of a level in preliminary negotiations which, while setting out some areas of tentative understanding, was by no means an expression of agreement *in præsenti*. It clearly contemplated not only the future formalization of defendants' assent to certain terms, but further negotiations to work out

additional terms and conditions; and that the contract was not to be considered binding until a formal written agreement had been executed.

When defendants returned from abroad, they attended meetings at their broker's office to discuss the terms of the lease. It was agreed that plaintiff Milton Brause, who was an attorney, could proceed to draw a formal long-term lease. In a letter dated August 31, 1959 addressed to defendants' attorney, Milton Brause acknowledged the receipt of $375 which he was to hold in escrow subject to the following conditions:

" 1. A long term lease will be prepared by Milton Brause or any other attorney he might designate to incorporate the provisions of your letter of July 15th, 1959, and oral conferences and conversations held thereafter, with reference to the above transactions.

" 2. If the proposed lease is executed by the parties, then the sum of $375.00 shall be returned to Mr. Rubin Liebowitz, Esq., attorney for Mr. Goldman.

" 3. If after the lease is prepared the transaction is not consummated, and the lease is not signed by the parties, then in that event Milton Brause may retain the said sum of $375."

This escrow agreement was subscribed to by Milton Brause and by defendant Marshall Goldman.

Plaintiff Milton Brause then proceeded to prepare a 30-page lease, a copy of which was given to defendants' attorney. However, before the lease was signed, defendants informed plaintiffs that they declined to go forward with the deal.

Plaintiffs, alleging that a complete, written agreement for a 99-year lease had been confirmed and entered into by the parties on August 31, 1959, brought this action for specific performance. Defendants interposed the Statute of Frauds as a defense and moved for summary judgment, contending that they had a right to withdraw from the negotiations at any time prior to the signing of a formal lease. Their motion for summary judgment was denied by Special Term.

It is difficult to piece together from the undisputed facts outlined above any understanding which might constitute a consummated agreement in writing for a long-term lease of the real property involved. There are three related documents which plaintiffs assert amount to a full, complete, and enforcible agreement to lease the property in question to them for a term of 99 years: (1) an enumeration of basic terms of the proposed lease in the letter of July 15, 1959; (2) an adoption of those terms by the letter and escrow agreement of August 31, 1959; and (3) a formalization of all the terms in the unexecuted

30-page lease. Only the escrow letter of August 31, 1959 was subscribed by either of the defendants. The "formal written agreement" contemplated by the parties—the lease itself—was never signed by either party; but it is the contention of the plaintiffs that there was a binding contract nevertheless.

Of course, when all the essential terms and conditions of an agreement have been set forth in informal written memoranda and all that remains is their translation into a more formal document, such an agreement will be capable of specific performance (*Sanders* v. *Pottlitzer Bros. Fruit Co.*, 144 N. Y. 209; *No. 2 & 4 Roman Ave.* v. *Goddard*, 220 App. Div. 138; *Sherry* v. *Proal*, 131 App. Div. 774, 143 App. Div. 928, affd. 206 N. Y. 726; *People* v. *St. Nicholas Bank*, 3 App. Div. 544, affd. 151 N. Y. 592; *Corn* v. *Bergmann*, 138 App. Div. 260). In such a case, there has been a full manifestation of mutual assent, and a complete meeting of the minds has been reached. All that remains is an integration of the agreement already made into another context which, unless otherwise specified, is not essential to evidence a consummated understanding.

But when the parties have clearly expressed an intention not to be bound until their preliminary negotiations have culminated in the execution of a formal contract, they cannot be held until that event has occurred. The necessary finality of assent is lacking. (See *Schwartz* v. *Greenberg*, 304 N. Y. 250; *Harvey* v. *General Cable Corp.*, 1 A D 2d 79, affd. 2 N Y 2d 986; *Belbird Realty Corp.* v. *Wolfson*, 221 App. Div. 67, affd. 248 N. Y. 615; *Westwitt Realty Corp.* v. *Burger,* 212 App. Div. 622, 626; *Franke* v. *Hewitt,* 56 App. Div. 497, 502.)

When the wording and sense of letters exchanged between the parties reveal no present intent to form a binding contract, but rather to continue negotiations with the possible ultimate meeting of minds deferred until some future time, either party may withdraw with impunity prior to that time (*Robinson* v. *Grace*, 278 App. Div. 693; *Arnold* v. *Rothschild's Sons Co.*, 37 App. Div. 564, affd. 164 N. Y. 562).

The writings exchanged by the parties in this case fall into this category. Defendants' attorney in his letter of July 15, 1959 was careful to state that the preliminary discussions and exchange of papers would not be deemed to constitute an agreement until the execution of a formal written agreement. He stated in so many words that pending the execution of such a formal agreement, each of the principals should be free to discontinue or withdraw from the negotiations. Insofar as defendants adopted the provisions of the letter of July 15, 1959 by authorizing plaintiffs to proceed to draw a lease, such

adoption necessarily included the provisions that the parties should be free to withdraw at any time before the execution of a formal lease. The very letter of August 31, 1959 which plaintiffs assert constitutes a written memorandum subscribed by the party to be charged, contemplates a continuing freedom of action and a right of withdrawal by either side. It provides that if the transaction should not be consummated after the lease had been prepared by Milton Brause, he would retain the sum of $375 for his trouble.

Under the circumstances it is clear that a lease was to be prepared incorporating the provisions of the letter of July 15 as its skeletal frame, but that it was also to contain material terms and conditions in addition to the nine specified in the letter. The letter, when adopted, may have represented a goodly distance on the road to agreement, but it was not journey's end. The draft of the lease, it is evident, would be not the mere recording of the parties' fully worked out understanding, but rather the basis for narrowing the area of future discussion, which could then focus on fixed and tangible provisions.

When parties agree to defer the binding effect of an agreement until the execution of a formal contract, subsequent scrutiny reveals that often the intervening memoranda or agreement may show assent to certain fundamentals, but still lack other essential terms and conditions which were left open for the refined and closely bargained wording of the ultimate document itself (*Belbird Realty Corp* v. *Wolfson,* 221 App. Div. 67, affd. 248 N. Y. 615; *Sherry* v. *Proal,* 131 App. Div. 774, 143 App. Div. 928, affd. 206 N. Y. 726, *supra*; *Nicholls* v. *Granger,* 7 App. Div. 113; *Wilbur* v. *Collin,* 4 App. Div. 417). The absence of any of the essential elements of an agreement is a bar to its enforcibility (*Willmott* v. *Giarraputo,* 5 N Y 2d 250; *1130 President St. Corp.* v. *Bolton Realty Corp.,* 300 N. Y. 63, 68).

The documents proffered by plaintiffs as evidencing a complete memorandum of agreement show fatal deficiencies and shortcomings. The letter of August 31, 1959 authorized the preparation of a lease that would incorporate not only the provisions set forth in the letter of July 15 but also the substance of " oral conferences and conversations held thereafter " which are nowhere further specified in writing.

Further, the letter of July 15 provided that the lessee was to have the right to demolish and alter the existing structure " under conditions more fully agreed upon in a formal instrument ". These conditions too were never spelled out by an agreement in writing other than in the proposed lease drawn

by plaintiffs — a document which defendants never subscribed. Further negotiations as to demolition and alteration rights would require agreement as to cost, types of new buildings, security, and the paying off of existing mortgages. It is not for the court to dictate such terms to the parties, for its function is to enforce agreements only if they exist, and not to create them by the imposition of such terms as it considers reasonable. (See *Mayer* v. *McCreery,* 119 N. Y. 434; *Weill Co.* v. *Creveling,* 181 App. Div. 282, affd. 223 N. Y. 672.)

The letters bear no indication as to the date on which the lease was to commence, the absence of which alone would render the memorandum unenforcible (*Antoville* v. *Bernard,* 220 App. Div. 210). Nor is anything specified as to the method of paying rent or the rights of the parties in the event of condemnation of the property or destruction by fire (*Weisz* v. *R. M. K. Realty Corp.,* 68 N. Y. S. 2d 533, affd. 273 App. Div. 781).

The provisions of section 259 of the Real Property Law, requiring agreements transferring certain interests in real property to be memoralized in writing subscribed by the party to be charged, are designed, among other things, to forefend the dangers inherent in leaving the gaps in incomplete writing to thereafter be supplied by parol testimony. And when the rights and liabilities of the parties are to be governed by an agreement extending for almost a century, the court should be even more careful to scrutinize informal memoranda which are said to constitute a complete and binding contract, to ascertain whether such memoranda do in fact sufficiently cover the numerous contingencies which would necessarily arise. "This was a letting of considerable magnitude and large interests were involved. The terms settled upon in the oral negotiations were the barest outline of an agreement upon so important a subject. They were such matters as would be discussed and agreed upon as preliminary to any practical negotiations, substantially merely, and the term and the rental, and they left untouched particulars which persons of the experience of these parties must have known would be certainly incorporated in any written lease." (*Franke* v. *Hewitt,* 56 App. Div. 497, 505.) To resolve conflicts 99 years hence on the basis of what may have been expressed in somewhat sketchy notes and in "oral conferences and conversations" between July 15, 1959 and August 31, 1959 confronts us with the very pitfalls which the Statute of Frauds was designed to avoid.

The missing elements in the preliminary memoranda cannot be supplied by umbilical reference to the actual detailed provisions of a lease which was drafted, but never executed. The case

of *Crabtree* v. *Elizabeth Arden Sales Corp.* (305 N. Y. 48) is urged upon us as supporting the proposition that the lease, even though unsigned by the parties, may be considered together with signed writings referring to the same transaction to show acquiescence by the party to be charged in its terms — an acquiescence allegedly sufficient to satisfy the Statute of Frauds. The lease, plaintiffs claim in effect, reflects the agreements arrived at in " further negotiations and discussions " and in " oral conferences and conversations ". It should be noted, however, that in the *Crabtree* case the supplemental and unsigned writing was a document prepared by the party to be charged evidencing his assent to the terms. An entirely different situation is presented where, as here, the plaintiff himself has prepared the supplemental writing, unsigned by the defendant, and offers it in satisfaction of the statute. Where the writing has been prepared by one other than the party to be charged, there is no assurance that the document represents an accurate rendering of a mutually agreed upon understanding rather than one party's latest round of proposals in the negotiation process.

This very proposition was rejected in *Chu* v. *Chu* (9 A D 2d 888), where this court noted: " In the *Crabtree* case all of the writings relied upon — which when taken together contained all of the essential terms of the agreement — were documents of the defendant and prepared by the defendant. To permit the unsigned document prepared by the plaintiff to serve as a portion of the requisite memorandum would open the door to evils the Statute of Frauds was designed to avoid."

The fact that plaintiffs were authorized to proceed to draw up a proposed lease, which the parties both contemplated might not be consummated, does not serve to show that its provisions were agreed on by defendants.

On many of the points contained in the lease prepared by the plaintiffs, defendants assert that there was in fact no acquiescence. The 30-page lease may therefore be viewed as a series of detailed proposals by plaintiffs, or as an inaccurate rendering of the agreement which may have been arrived at between the parties, or as a counteroffer different in some respects from the terms and conditions previously discussed. Absent some writing indicating acquiescence by defendants in its terms, it certainly cannot be considered as the formal reduction in writing of the provisions of the letter of July 15, 1959, the " oral conferences and conversations held thereafter ", and the adopting letter of August 31, 1959.

Under all the circumstances it would appear that there was no final and complete meeting of the minds, that the memoranda

336

relied on by plaintiffs are insufficient in and of themselves to constitute a binding agreement, and that with material elements left for future negotiation defendants were not bound and could withdraw from the negotiations without incurring any liability other than the loss of the $375 escrow money. Under no circumstances can a case here be made out for specific performance. The order appealed from should therefore be reversed on the law, with costs to defendants-appellants, and the motion by the defendants-appellants for summary judgment should be granted.

RABIN, M. M. FRANK, VALENTE and STEVENS, JJ., concur.

Order unanimously reversed, on the law, with $20 costs and disbursements to defendants-appellants, and the motion granted, with $10 costs, and judgment is directed to be entered in favor of the defendants dismissing the complaint, with costs, and directing that the *lis pendens* filed in the office of the Clerk of the County of New York on October 14, 1959 be vacated and cancelled of record.